Salad of the Sundays, Marlowe, Mission Investor Commission, 510-0157. Counsel, please. May it please the Court, good afternoon, Mr. Davis. Justice McCullough, I'll let you know that I had a salad for lunch today. You have done what? A salad for lunch today. So did we. Well, my associates didn't realize it. We're just seeing the specter of you and Mr. Whistle several times in the past year. So we could at least say something to you. Please proceed. I'm here today on behalf of the appellant, Relda Zacheis. The issue that is before the Court is whether an employer-employee relationship exists between the appellant and the appellee. The arbitrator and the Commission found that there was, on review, the Circuit Court reversed, finding that there was no employer-employee relationship. The first thing we have to discuss is the standard of review that was employed by the Circuit Court in rendering their decision. They reversed the Commission, first finding that the employer-employee relationship did not exist in this case as a matter of law, employing a de novo standard of review. Clearly, there are different inferences that can be drawn from the facts in this case. And given the fact that there are differing inferences that can be drawn, it was not proper to reverse the Commission using a de novo standard. Just as a simple example, with some of the documentary evidence that we have in this, whether it's the incident report, the W-2s, the handling of this lady's payroll, all of those things obviously can result in different inferences being drawn as to their significance and their meaning. And because of that, I believe it was clearly error for the Circuit Court to reverse using a de novo standard. They also reversed on Memphis Way. And I believe that is the correct standard of review for this case. Whether an employer-employee relationship exists is uniquely a question for the Commission to resolve. They did so, both at the arbitration and the Commission level, finding an employer-employee relationship. Evidence exists in the record that supports that finding. It was error for the Circuit Court to, in essence, re-weigh the evidence and come to a different conclusion. And I'll give you some examples of evidence in the record that supported the Commission's finding. First, this lady was hired by the Kings, who are the owners of the affilee. And they placed her on the company payroll. Following her accident, a supervisor incident report was prepared by Ms. Pettenke. In her words, as part of our, referring to Aviston, work comp procedures, private individuals do not complete incident reports. And she testified that she did it because that's the procedure to be followed at Aviston. The employer name on that incident report was Aviston. In addition, as you know, W-2s were issued for this lady with her employer shown as Aviston. After her injury, and while she was on limited duty, Aviston accommodated her with her work restrictions. There are no indicia at that time of this lady being hired by Aviston. She was simply accommodated at that time. There wasn't an employment application prepared, no interviews done. She was simply accommodated by the employer. When her restrictions then, in essence, became permanent, because of her need for additional surgery, which is actually how this case came about, on a 19B petition because of additional surgery that had been recommended for her that was then denied, she was transferred by Aviston to Mount Vernon Countryside Manor, which is another nursing home that's owned by the Kings. When that was done, a new employment form was filled out, indicating that the transfer was being made from Aviston Countryside Manor to Mount Vernon Countryside Manor, and this lady's employer in that transfer on that form was listed as Aviston. So there is a wealth of information in this record that supports the Commission's conclusion. I'll look at the opposite side of the coin for a moment to play devil's advocate, if you will. I suppose somebody on the other side could argue, are we exalting form over substance here? And there is a paperwork trail that would support that argument. What about the counterargument? As we know, I think we can agree, whether an employment relationship exists is a question of fact. You look to one of the factors, the important factor is the right to control the manner in which the work is done, the right to control the schedule. Arguably, she was there working as a personal housekeeper of the Kings and their daughter at their homes. She cleaned the King's corporate office and their cabin. She performed no housekeeping duties at Aviston. As I understand, she never set foot in Aviston's facility prior to the work accident. That's correct. So how do you argue against those factors being an issue of employment personally by the Kings? I think the main argument against that is that she was placed on the company payroll. And then you have the testimony of the accountant who said that we had to take care of that. It was a problem for them because of Medicare. And they basically made a change in the way that their books were handled to remove her salary. And place it into what was called a drawing account. Which sounds to me as if what was happening was simply the money for that was set aside in their bookkeeping. And that's all it was. It was actually form over substance. The Kings, as you know from the record, are the principals at Aviston, at King Management, as you mentioned,  They are the owners. They did the hiring. They did have the right to terminate her. I will concede that this is a close case. However, there are facts that support what the commission did. Other than the paperwork that you talked about, what specific factors, work-related duties, assignments of the claimant, would weigh in favor of her being an Aviston employee, not a personal employee of the Kings? In looking at the facts in this, what was most telling to me about the facts was that after her injury, and she was placed on limited duty, she was immediately given a job that allowed her to work within those restrictions. In the job she was doing previously. She had to be on her feet, walking, cleaning, doing those types of things that she could not do then. She is immediately accommodated by Aviston. And at that point in time, as you point out, is when she was first in the nursing home proper. But she was not hired by the nursing home. There was no change at all in regard to how she was paid. She was not hired. There was no even new employment. What did she do for Aviston, independent of what she did for the Kings and their daughter? What did she do that wasn't related to the Kings' direction and the daughter's direction to her? At what point in time are you talking about that? At any point in time. But clearly, after her injury, when she's accommodated, she's doing work for Aviston. I believe her testimony was working in the x-ray department. What about before the accident? Before, she was primarily helping them with housekeeping at their two homes, as you mentioned. At King Management, which is the management company that the Kings own. In terms of how it benefited, if you will, the nursing home, if you want to try to segregate it out that way, I think the testimony was that she began working for Ms. Pedke when she was pregnant. And was at her house a great deal when she was working long hours at work. I mean, clearly she was helping Ms. Pedke, who is the supervisor, by maintaining her home, and cooking dinners for the family, et cetera, while she's putting in long hours at the nursing home. If we were cynical, one could suggest that the Kings converted a non-deductible employee to a deductible employee for Aviston Incorporated, and it's nothing but a sham. If we were cynical. If we were cynical. But we're not, by nature. Things like that. Let me ask a question about that. The accounting changes were all made after the injury, right? And the Kings reimbursed, or somebody reimbursed the corporation for her salary. Was that after the injury that that happened? Well, I don't believe that's entirely correct. First of all, there isn't anything in the evidence that the Kings reimbursed anyone. There was this drawing account created where the money was segregated out, but the money that was in that drawing account is corporate profit. There was no evidence that the Kings ever wrote a check to reimburse the corporation for that. In regard to the other portion of your question, and Mr. Davis will correct me if I'm wrong, but I believe that this accounting gimmick, if you will, existed before this accident, and it was being done because of concern about Medicare audits and what they might say if they saw it. But the accounting gimmick could have been handled in different ways, I suppose, though. In other words, why couldn't this have been treated as a benefit to the administrator to be able to use it as an employee, and then the administrator pays taxes on that benefit? Well, there is that. That's right. I agree. And that would weigh in favor of being an employee. But the employer had complete discretion over what kind of gimmick was going to be used. Well, I think it's clear that the Kings were in control of the situation that they created here. I believe that's absolutely correct. Is there anything else I can answer? Thank you. Counsel, please. May I please record, Mr. Wertz. My name is Dave Davis. I represent Anderson Countryside Manor in this case. Was Petke an important witness in this case? Important in how so, sir? I think she's important to the standpoint that she says, look, I never hired this lady for a nursing home. I think this is a fairly simple set of facts. We're all private people. We've all got jobs. I'd like to hire somebody to work and clean my house, and maybe if I'm well enough to do it, I'd do it. And if I'm going to spend six months out of the year in Florida, as the Kings did, and unlike certain high-profile members of Congress who got in trouble for not making social security deductions and what have you, I decide, you know, I am just, I don't know how to calculate FICA, Medicare, I don't know. That's just beyond me. Know your limitations in life. That's one of mine. I just want somebody to come and clean my house, and I'm willing to pay them to do it 40 hours a week. But I'm going to be gone six months out of the year, not good at the math. I happen to own four or five different corporations. They've got payroll processing. They've got people that do nothing but payroll. I'm going to pick one, anyone. Pick Corporation A, say, hey, listen, you know, or so-and-so, there's going to be wages come in, I want you to actually do the paperwork, cut the checks, do all the withholding and all that jazz. Is it important as to what you tell them to do and why to do it? I think in terms of employer-employee, that is a factor. And here the factor is merely one of convenience. In other words, the kings aren't saying, you know, I've got a, if this was a private newspaper ad, this lady was hired privately, it's a private transaction, come to my house, and she did. That's all she is. She's coming to our houses to work. I happen to have a corporate. Yes, she is. Denise King is a corporate. She did. Well, she put the employer as being an absent countryside man in a trial. She says she did that because that was technically where the paychecks came from. But what the commission... Well, there's no dispute that the paychecks come from absent countryside manor. They're payroll people. The payroll people are told, cut these checks for this lady. When the kings are gone six months out of the year and they don't want to be bothered by it, they've got some entity that's skilled that knows how to do this, that's what they do. And they did. Is it correct to say that the claimant did work at the nursing homes? No, sir. He didn't do it directly? The issue is whether you're an employee or employee, of course, at the time of the accident, March 7, 2005. Afterwards, the kings, seeing that this lady is in a bad way, say, you know what? We've got businesses. And, you know, this gal can't work for us as a housekeeper anymore. We've got other nursing homes, like Mount Vernon Countryside Manor is another one of their homes. She never went to work for Abistin Country. Did they make police or anything clear with the claimant as to what her job was and who she was working for? Absolutely. There's no issue about that. She was hired to work for these people's private homes. Who hired her, the daughter or the kings? The kings. All right, the kings hired her. Marilyn King hired her after replacing a newspaper. She came out to the king's private house and said, this is what we clean our house of. So, Petke, the daughter, is Abistin's administrator, as I understand it. And yet, the claimant never interviewed with Petke. No, no, no, no, no. No, no. Mr. and Mrs. King wanted somebody to clean their house. So, they hired this gal. And then they realized, well, we hired you for 40 hours a week. We don't have 40 hours a week worth of work. And that's where Mrs. Petke's testimony is important. Sure, she helps fill in these explanations here. And so, the kings, Mr. and Mrs. King said, we've got daughter Leslie, daughter Denise, clean their houses too. And we'll pay for it. All right, so without being cynical, what is your response to opposing counsel's argument that there is a vast paper trail to support the fact that the claimant is an employee of Abistin? Well, you know, we get into this form over substance, just like you said. And we can't let labels determine the relationship. I think the law is pretty clear in that regard. So, if you've got a contract that says, well, you're my employee or you're an independent contractor, we look beyond that. Somebody can write, you know, my employer was this, my employer was that. Let's look at the facts. The commission never looked at the factors that have to be applied in determining a case like this. They didn't do it. The right to control. Who had the right to control Ms. Zaki's? Mr. and Mrs. King at their private house. And they did so. They said, come work these hours, these days. Go work here. Come and help me for my Christmas party. Come clean my cabin. Whatever we want you to do, that's what we've got you doing. They exercised control over Ms. Zaki's, consistent with a normal private housekeeping relationship. What's the relationship between the employer's business and Ms. Pecky's business? That's the other main factor that courts look at. And that's a complete disconnect. We're talking about a nursing home. Their sole purpose is to run the business. It wasn't disconnected enough that she wasn't paid by them. She was paid by the nursing home, wasn't she? It was just run through them. Initially, the checks came out of their payroll processing, but as the accountant explained, the net effect of the accounting changes that he did at the end of each year prior to the accident was to show that the Kings were personally reimbursing the corporation for all of the expenses. And it's important to point out the reason why that happened. Again, the Kings are sitting here saying, we didn't realize there were these unintended consequences. I don't want the burden of having to do my payroll and all this jazz. So I'll just let one of my companies that knows how to do it, they'll do it. And then unintended consequence being, well, that can get you in trouble with the Medicare, IRS, and all those things because the only expenses that can be run through a nursing home are nursing home expenses, not personal. So the accountant, upon discovering that private housekeepers, including Ms. Zacky's and two others, were being run through the corporation of the nursing home, that would create all kinds of potential problems for the nursing home. So he says, no, no, no. We've got to have you reimburse the corporation for the wages, the insurance, everything. And that was done. And when that problem was discovered, they didn't change their manner of operating, though. Again, because they're no good at this. For their convenience, I've got a private housekeeper. I've got somebody who's a debtor. They can issue the paycheck weekly. How am I going to do that when I'm down in Florida? And I want to do the withholding so that they're paid. I'll reimburse them. So yes, we can reimburse them. So they could have had one of these people that are a debtor do it in their name. I don't know. They didn't have to issue a paycheck to her in the name of the nursing home. I'm sorry? They didn't have to issue a paycheck to her in the name of the nursing home. Well, at the time they did, because they were just paying it out of that, and they didn't realize that was a problem. Is your position that this lady is an independent contractor? My position is she's an employee of the King's. She was a 40-hour a week. They hired her. 40 hours, one-week vacation. We'll pay you a bonus to cover your health insurance. Okay, so we're just trying to find out who's the employer. It's the King's. They hired her. Did they file a tax return showing that? I don't know, sir. Their tax return's not put in evidence. Do you think Abbotton did? I don't know, sir. I know that the accounting changes were done at the end of the year to clarify that. If this lady was an Abbotton side employee, they would not have had to go through the rigmarole. They wouldn't have had to pay the accountant to back out everything. Apparently, they thought it would just be easier to continue letting one of their payroll processing folks do all that and reimburse them at the end of the year. What's wrong with that? Are they self-insured? The nursing home? That I'm not sure. There's a pool. It's a risk. It's a pool of assets. I'm talking in terms of workers' comp coverage. Yeah, it's a pool. But the thing is that even if you say, okay, and again, the Sankey decisions, Sankey Brothers' decisions, which was cited in Ms. Anki's brief, there was a similar situation. You had a contractor and a subcontractor. The contractor says, I'm making all the payments to this particular, to the claimant. Meanwhile, I'm getting reimbursed by the sub. And the issue was, well, employer-employee. And the general said, well, I paid all this stuff up front. You know, therefore, you know, that makes me an employer. The court said, eh, not so fast. You're reimbursed. You're not the one that was paying these people. And there's no dispute in this record that it was the kings personally who paid Mrs. Anki's. Is there any merit to the argument that they might have been a lending employer? Well, I don't think so. And again, I just want to get back on, I think that issue was waived. It was never raised by any of the parties. I think the answer to that question is, another question, did she ever do any work for Aviston Countryside Manor before the date of her arrest? No, never. Never, never. Did she ever set foot on their premises? No. She's a private housekeeper. She just, the kings have got a bunch of corporations, and they just said, okay, pick one, anyone, do the payroll for us, please, and then we'll reimburse them. Looking at all the other factors that you have to look at in terms of employer-employee, right to control, that's clearly not the nurse. The nursing home didn't tell her where to go to work, what supplies to use, what laundry needed done at the home, what kids needed picked up, what grocery shop. Mr. and Mrs. King and Leslie Pesky, Denise King, the private housekeepers directed this lady. The relationship between what work she was doing, private housekeeping, and the work of her alleged employer, Aviston Countryside, patient care versus private housekeeping, they're not one and the same. Who provided the supplies, the instrumentalities for Ms. Zaki's? It was the kings. And Ms. Pesky, they gave her all that. Does Aviston have any employees that actually mop floors? Sure they do, you bet they do. If this would be different, if she had been, you know, she'd been working, she put on the uniform, she punched the clock, and she shows up at Aviston, and then they say, well, listen, we need you to go to my house, I've got a party tonight, will you go there and clean the house for me? And she gets injured entering the house, and of course that's how she got injured here, entering a private house to clean it. Different case. That's not this one. Or if, you know, Jerry King calls her up one day and says, say, listen, I've got a shortage out at the nursing home. We're down to one housekeeper. Today, instead of cleaning my house or whatever, go out there. And in the parking lot of Aviston Countryside Manor, she slips or she somehow injures herself, that the employee of Aviston under those facts? Different case. Here it's not even close. All the factors you'll look at, including who withheld the taxes. Initially, it might look like Aviston withheld the taxes, but then they were reimbursed. They were made whole. All the other factors that you're supposed to look at, but which the commission majority didn't. Say, this lady's a private housekeeper because that's what she was. She admitted that she was. Who provided the key to get in? The key was Leslie Petkey. She was locked out of the house, and so she called Leslie and said, where's the key? And Leslie said, it's on top of the sliding door. And so she pulled the flower pot over to get the key and rolled her ankle coming down. So things were going well until she lost track of the key. And that was the turning point in why we're here. That's true. That's true. But again, look at the Supreme Court in Robeson. They recite these factors. You guys know what they are by heart. And the only one which maybe, maybe favors her, and that's at first blush, is this notion of who withheld her Social Security and whatnot. And it looks like Aviston did. That they were reimbursed. And there's no dispute about that. Again, this is a simple case. We have a private housekeeper who gets injured trying to get inside the house of the person whose house it is. Is there any background as to why the Kings would come up with such an arrangement? It wasn't for convenience. They're in Florida six months out of the year. It wasn't for convenience or benefit for some unforeseen reason. When you're reimbursing the corporation for everything that, I don't see how they benefit. There's no evidence of that, Your Honor. There's no deduction entitled for that reimbursement. Excuse me? There's no deduction on their part for that reimbursement for the corporation on their personal income tax, I would think. I don't know. When the accountant testified, he said that, you know, I made changes so that the amounts that the corporation had paid to Ms. Zankees were now being paid by the Kings personally. And he did that because Mrs. King was not an employee of the nursing home. If Mrs. King was an employee of the nursing home, why go to all that trouble? You don't have to. She's your employee. The problem is that nursing homes are highly regulated entities. It's like if we're lawyers. We're not supposed to be running our personal business through the law firm. If we do, we can get in trouble. Well, you've got some guy running a law school who doesn't know that. And his accountant says, running through the corporation? Whoops, sure did. My private housekeeper. My wife loves her. Well, that's a problem because if somebody did it well, then what do I have to do to clear this up? Reimburse the corporation. If you're doing the same thing that you were doing this problem with? Well, I don't think it was presented to Kings as being a problem if you reimburse them. We don't have a canon of ethics like we may have. But in their context, there's nothing criminal or anything else that says, you know, the accountant's not saying, by God, you can't do this and never do it again. He's saying, well, just reimburse them at the end. But, again, that's a single scintilla factor. And they reimbursed them. And why is the accountant saying that? You're saying, well, it's because they're highly regulated. The truth of the matter is the accountant's saying that because they'd have to report that as income. Well, he was – and, again, I'm not an accountant. He was saying it's a tough chapter to ask. Your time is up, Counselor. Okay. Is there any record that would show how workers' comp is being handled on behalf of the employees? The employees of Aviston? Yes. I'm not sure I understand your question, Justice Holdrege, in what regard. I mean, there is work comp coverage for the Aviston employees. All right. Is there any record list of the employees still covered under that, the set premium? The underwriting page or deck sheet, if you will, that was not put in evidence. I haven't seen it. With a corporation of any size, usually the employees aren't listed by name. There's usually a number or a range. So I'm not sure that would have helped us here. Because it is fairly large. That's just my – I'm just drawing from my own experience here in regard to those deck sheets. The smaller ones, it is. It very well could be, absolutely. But if you're over a certain size, I think it's more of a range. Any indication whether the Kings carried workers' comp insurance? I doubt it. I do, too. And the Kings were never named as a respondent in this or any other application? No, they were not. To my knowledge. Very briefly, the Kings did not pick Aviston at random. Let's just decide which one of our corporations were going to do this. They selected Aviston to be the employer for this lady. No corporation can act except through its principles. They are the principles. Aviston, then, is the company that accommodated this lady after she was injured. There's absolutely no evidence that she was then hired all of a sudden by Aviston. Mr. Davis would have you believe at that time she still works for the Kings. That doesn't make any sense. If this lady was, in fact, first employed by Aviston after her injury, where's all the indicia of that employment relationship? Where's the tax information that would be completed there? All the documentary evidence that would go with becoming an employee at that point in time for the first time at Aviston, where is it? It's not there because nothing changed. They accommodated her. This ad that she answered initially, who placed that ad? You're taxing my memory of the record. I'm sure it was one of the Kings. I'm fairly certain it was one of the Kings. She called the Kings to interview for the position, so logic would dictate the Kings placed the ad. And that may be the best we have on that point. Okay. After then, her limitations and innocence become permanent because of the need for this additional surgery has been denied. She then clearly is transferred from Aviston to Mount Vernon. And that's in the documentary evidence. And it's shown that she was transferred. And it's shown that her employer is Aviston at that time. The point being, and hopefully Mr. Davis and I have made this well collectively, there are different inferences that can be drawn from the facts in this case. Except for the fact that, if this is honest, she is an Aviston employee, if I'm making the argument, which is a nursing home, in that she never sets foot into the nursing home premises or onto the nursing home premises. That's a little troublesome. And that's why the facts in this case are, I agree, that's why the facts in this case are troublesome. And never does any work for Aviston either, prior to her removal. She's doing work for the owners of the corporation. Yeah, unless you call doing personal housekeeping for the owners of the corporation or work for the corporation. And there's nothing wrong with that. There's no prohibition against that. The Internal Revenue Service might think there is. Well, there's no prohibition against that. It's an imputed income issue for the case. That's all it is. Nothing to the corporation. I'll just conclude by saying, if there is some evidence in the record that supports the Commission's decision, it's a fact question. The Commission made a determination here. And the evidence should not have been reweighed by the Supreme Court. Thank you, County. We'll take the matter under advisory for this position.